**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**ALBANY DIVISION**

| | |
|---|---|
| **GAIL COLLINS, DEAN DEVITO,**<br>**MICHAEL LAMOUREUX, and**<br>**SCOTT LOBDELL individually, on**<br>**behalf of the Northeast Grocery, Inc.**<br>**401(k) Savings Plan and on behalf of all**<br>**similarly situated participants and**<br>**beneficiaries of the Plan,**<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**NORTHEAST GROCERY, INC.; THE**<br>**ADMINISTRATIVE COMMITTEE OF**<br>**THE NORTHEAST GROCERY, INC.**<br>**401(k) SAVINGS PLAN; John and Jane**<br>**Does 1-30 in their capacities as members**<br>**of the Administrative Committee,**<br><br>      **Defendants.** | **CIVIL ACTION FILE NO.:** 5:24-cv-00080  (DNH/ MJK) |

**CLASS ACTION COMPLAINT**

**I. NATURE OF ACTION**

1.      Plaintiffs Gail Collins, Dean DeVito, Michael Lamoureux, and Scott Lobdell (collectively "Plaintiffs"), individually, as representatives of the Class described below, and on behalf of the Northeast Grocery, Inc. 401(k) Plan (the "Plan"), bring this action under 29 U.S.C. § 1132 against Defendants Northeast Grocery, Inc. ("Northeast Grocery"), the Administrative Committee of the Plan (the "Committee"), and John Does 1-30 in their capacities as members of the Committee (collectively, "Defendants"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.

2.      Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e., 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner by which participants bear the risk of high fees and investment under-performance.

3.      As fiduciaries to the Plan, Defendants were obligated at all times to act prudently and for the exclusive benefit of participants and beneficiaries. This Defendants did not do.

4.      Plaintiffs bring this action to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches and prohibited transactions described below, and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. U.S.C. § 1102(a)(3).

## II. JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(a), 29 U.S.C. § 1132(a).

6.      Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Northeast Grocery's principal place of business is in this District, and because the Committee is located in this District.

## III. THE PLAN

7.      Established by Northeast Grocery on February 1, 2008, the Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401.

8.      According to its Investment Policy Statement, the Plan was established to provide retirement benefits to eligible employees of Northeast Grocery and its participating affiliates through the long-term accumulation of retirement savings.   At inception, the Plan was named the Tops Markets, LLC 401(k) Retirement Savings Plan (the "Tops Plan") and covered substantially all non-union employees of Tops Markets, LLC, Tops PT, LLC, and Erie Logistics, LLC (collectively, "Tops"). In November 2021, the Golub Corporation, owner of Price Chopper Supermarkets ("Price Chopper") and sponsor of the Price Chopper Associate 401(k) Plan (the "Price Chopper Plan"), merged with Tops. As a result of this transaction, the Price Chopper Plan was merged into the Tops Plan and thereafter renamed the Northeast Grocery 401(k) Plan (i.e., the "Plan").

9.      Based on comparing each Annual Return/Report of Employee Benefit Plan (Form 5500) for each Tops Plan, all of the investments for (1) the Tops Markets, LLC 401k Retirement Savings Plan for Union Associates and (2) the Tops Markets, LLC 401k Retirement Savings Plan, were managed identically (by the same Committee and under the same Investment Policy Statement (IPS)). In fact, additions and removals of investments were identical during the same plan years (as far back as the inception of the Union plan on January 2, 2014).

10.     At all relevant times, the Plan authorized participants to direct their retirement assets into a pre-selected menu of 28 investment offerings consisting of, among other things, target date funds and investments in other Morningstar® categories (i.e., value, blend, growth) such as: large cap stock, mid cap stock, small cap stock, international stock, bond, and cash/stable value.

11.     At all relevant times, the Plans qualified as "large" plans. In 2017, the Golub Corporation's Plan (Price Chopper Associate 401(k) Plan) had approximately 14,447 participants and over $193,488,799 in assets across all investments. In plan years 2017 to 2021, the Plan had

13,287, 13,610, 13,910, and 13,908 participants, respectively. In plan years 2017 to 2021, the Plan had $210,419,442, $241,004,409, $181,668,845, and $272,420,470 in assets, respectively.

12.      In 2017, Tops Markets LLC sponsored two plans (401(k) Retirement Savings Plan and 401(k) Savings Plan for Union Associates). The non-union Plan had approximately 2,272, 2,223, 2,206, 2,209, 2,341, and 2,230 participants during plan years 2017 to 2022, respectively. In plan years 2017 to 2022, the non-union 401k plan had $170,806,421, $153,055,147, $178,887,900, $202,977,065, $229,727,764, and $183,430,278 in assets across all funds, respectively.

13.      As for the Tops Markets LLC 401(k) Savings Plan for Union Associates, the sponsor reported total participants for plan years 2017 to 2022 to be, respectively: 1,108, 1,036, 1,022, 1,037, 965, and 1,121. Assets for the same plan years were $31,575,063, $36,637,492, $45,549,744, $53,914,371, $59,044,183, and $48,072,122.

14.      CapFinancial Partners, LLC ("CapFinancial") has served as financial advisor and investment manager for the Plan since 2017. Fidelity Management ("Fidelity") has served as the Plan's recordkeeper as well as Directed Trustee since 2009.

**IV. THE PARTIES**

15.      At all relevant times, Plaintiff Gail Collins ("Collins"), by virtue of her employment with Price Chopper and participation in the Price Chopper Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Collins is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, Collins was invested in, among other funds, the Wells Fargo Stable Return Fund, Lord Abbett Multi-Asset Balanced Fund, Dreyfus Strategic Value Fund, and TRowe Price Blue Chip Gr I Fund. As a result of the Defendants' mismanagement of

4

the Plan and violations of ERISA, Collins was subject to excessive fees and underperformance and, as such, suffered financial losses.

16.     At all relevant times, Plaintiff Dean DeVito ("DeVito"), by virtue of his employment with Price Chopper and participation in the Price Chopper Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, DeVito is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, DeVito was invested in one or more of the funds discussed below. As a result of Defendants' mismanagement of the Plan and violations of ERISA, DeVito was subject to excessive fees and underperformance and, as such, suffered financial losses.

17.     At all relevant times, Plaintiff Scott Lobdell ("Lobdell"), by virtue of his employment with Price Chopper and participation in the Price Chopper Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Lobedell is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, Lobdell was invested in, among other funds, the MFS Value R6 Fund, the T.Rowe Price Bl Chip Gr I Fund, and the American Funds NewPrsp R6 Fund. As a result of Defendants' mismanagement of the Plan and violations of ERISA, Lobell was subject to excessive fees and underperformance and, as such, suffered financial losses.

18.     At all relevant times, Plaintiff Michael Lamoureux ("Lamoureux"), by virtue of his employment with Tops and participation in the Tops Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Lamoureaux is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, Lamoureaux was invested in one or more of the funds discussed below.

As a result of Defendants' mismanagement of the Plan and violations of ERISA, Lamoureaux was subject to excessive fees and underperformance and, as such, suffered financial losses.

19.     At all relevant times, Defendant Northeast Grocery, a powerful supermarket alliance with a revenue of $8.4 billion and number 68 on Forbes' 2023 list of America's largest private companies, is the sponsor of the Plan per ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B); a party in interest under ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A), to the extent that it appointed members of the Committee and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

20.     At all relevant times, Defendant the Committee was the Plan administrator under ERISA § 3(16), 29 U.S.C. § 1002(16); a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had or exercised discretion over the administration or management of the Plan and/or control of Plan assets.

21.     At all relevant times, Defendants John Does 1-30, as members of the Committee, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets. Plaintiffs will seek leave to amend the Complaint to name each of these John Does once they ascertain their identities in discovery. The Committee and John Does 1-30 will be referred to collectively as the "Committee."

## V. FACTUAL ALLEGATIONS

**A.      The Committee Violated ERISA's Duty of Prudence.**

22.      The Committee lacked a prudent process to select and monitor Plan investments, performance, and fees. It also lacked a prudent process to monitor and control Fidelity's recordkeeping fees.

**1.      The Committee Lacked a Prudent Process to Select and Monitor Plan Investments.**

23.      An ERISA fiduciary has a continuing duty to monitor trust investments and remove imprudent ones.

24.      Likewise, Plan fiduciaries must "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts Ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

25.      Adherence to these duties requires regular performance of an adequate investigation of existing investments in a plan to determine whether any of the plan's investments are improvident, or if there is a superior alternative investment to any of the plan's holdings.

26.      An examination of the cost and fee structure of the Plan shows that the Committee did not have a viable methodology for monitoring or controlling the costs and expenses of its investment options.

27.      Modern Portfolio Theory (MPT), Prudent Investor Rule Restatement (Third) Trusts and ERISA's prudent expert standards required the Committee to have a prudent methodology for making sure participants' money was spent wisely.

28.     As described below, the Committee failed in this task to demonstrate the competence, skill, effort, and diligence required of a prudent fiduciary.

   **a.**  **The Committee Failed to Investigate the Availability of Lower-Cost, Equally or Better Performing Share Classes.**

29.     At all relevant times, most of the investment funds in the Plan during the Class Period were comprised of dollar-par investments (stable value and money market), including variable priced mutual and collective funds.

30.     Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs. All share classes charge fees for managing the investment fund. While the costs may differ, the managers, investment styles, and stocks are identical.

31.     The two most common types of mutual funds are retail funds and institutional funds. Retail class shares – such as class A, B, and C shares – are available to a broad spectrum of investors, including individuals, while institutional class shares – such as class I and R6 shares – are typically only sold to larger investors, including 401(k) plans. Institutional mutual funds typically charge lower expense ratios than do retail funds with similar holdings and risk characteristics.

32.     A prudent fiduciary must have a viable methodology to monitor and select proper investment options and can easily spot the best share class options for the Plan.

33.     Mutual funds, moreover, are not static, and share classes change over time as lower share classes are issued. Therefore, a fiduciary with a prudent methodology will monitor and evaluate the share classes of the available mutual funds and have established a process to move the Plan's assets into lower cost share classes as they become available.

34.     Low-cost institutional share classes of mutual funds compared to high-priced retail shares are readily available to institutional investors, such as the Plan here, which can easily meet

minimum investment amounts for these share classes. Also, based on funds in these Plans' Forms 5500, prospectuses indicate that minimums are waived when the funds were held in trust (by defined contribution plans).

35.     Here, however, the Committee, throughout the Class Period, repeatedly failed to monitor, explore, and consider the lowest cost share class options for investments in the Plan. Instead, the Committee deliberately selected and thereafter retained the more expensive share classes of the same fund even though identically managed, higher yielding, higher returning types of the same fund were then available.

36.     One example is the T. Rowe Price Retirement Trust "A" (Common Collective Trusts) target date series, which at all relevant times was available for selection in the investment line-up in the Plan. The Committee did not investigate and, therefore, did not consider that many other cheaper, identical share classes of this Fund existed. Instead, the Committee always defaulted to the most expensive "A" share class.

37.     Another example occurred with the institutional ("I") share class of the Loomis Sayles Small Cap *Value* Fund (held in Price Chopper's Plan; the Loomis Sayles Small Cap *Growth* was held in both of the Tops' defined contribution plans), which had been offered under the Plan since 2009. In 2017, the Committee finally recognized that a cheaper, better-performing share class ("N") of the same fund had existed since 2013. Only then did the Committee change from the more expensive "I" class to the "N" class. Given the difference in yields (the "I" class yielded 0.35% per year as compared to the class earning 17% more (0.41% yield by the 'N' class)), the Committee's failure to investigate this share class for many years and transfer the "I" class shares into the "N" class shares sooner cost participants millions in benefits and lost investment opportunities.

38.     A prudent fiduciary conducting an impartial review of the Plan's investments, at the very least, would have identified the alternative share classes available and investigated them instead of defaulting to the higher-priced share, equal or lesser-performing share classes like the Committee did.

39.     The Committee lacked any good-faith explanation for selecting and retaining the higher-priced and poorly performing share classes when the lower-priced, higher-yielding, and better-performing share classes were available (of the same SEC-registered fund (same SEC "Management Company ID")). The Plan did not receive any additional services or benefits based on its stagnant continuation of the more expensive share classes. The only difference between the two shares classes was a higher price and lower returns. Based on prospectuses, the fact that the Plan would have qualified for the lower-cost classes further supports the notion that the Committee lacked a prudent process for monitoring each Plan's investments.

40.     Based on Forms 5500, Tops' Committee chose the Loomis Sayles Small Cap *Growth* revenue-sharing class that credited them fifteen basis points for every wage dollar invested. The credits came from increased expense ratios over the cheaper, identical class "N" version. Participants' returns each week were decreased more than if the Committee chose the "N" class.

41.     The Committee's IPS metrics stated the fund class with the higher peer rankings should be chosen. The Committee failed to follow their IPS because in the year they added the Loomis Sayles Small Cap Growth (plan year 2020), the 15-year as well as the 10-year "Category Rank" was higher for the N class along with the 5-year, 3-year and 1-year rank. The Committee's class earned 128.58% for the 5-year total return (the longest lookback period when the Committee's conduct occurred in 2020). However, the cheaper class' 5-year return was 130.04%

in 2020. That means the annual difference was about 30 basis points (thus, twice the 15 basis points revenue-sharing credits the Committee sought each year).

42.     The cheaper classes of both Loomis Sayles Small Cap Value (Price Chopper) and Growth (Tops) funds had identical aims and risks, but the cheaper class managed by the same SEC-registered portfolio manager had better IPS return metrics. The alpha for the Committee's class of the Loomis Sayles Small Cap Growth over the prior 3 years before adding the fund (in 2020) was 3.42 but the cheaper version was better at 3.55. The Committee's IPS' metric called "Confidence" relates to the information ratio (IR). It was higher or better for the 3-year and 5-year lookback periods in the plan year 2020 (when the Committee's decision-making occurred to add this fund/class to the participants' menu of choices).

43.     Other IPS metrics showed that Fidelity's target date funds lagged behind target date funds with similar aims, risks, and rewards. These IPS metrics were ignored by the Committee for many years. Failing to monitor the Plan's most significant investment (and participants' default fund) had disastrous consequences for the Plan and cost participants tens of millions of dollars in retirement savings. Not only were participants charged excessive spread fees on an undiversified fund, but they also lost the opportunity to invest their money in asset classes that delivered higher returns.

### b.     The Committee Failed to Investigate the Availability of Lower-Cost, Better Performing Alternative Funds.

44.     Some mutual and collective funds charge fees for investment management and other services such as sub-transfer agency or recordkeeper services. Such fees are calculated using that fund's expense ratio, which is a percentage fee of the participant's assets in that fund.

45.     Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees dramatically reduce the amount of benefits available when participants are ready to retire.

46.     The Committee funneled employees' retirement savings into funds with extra fees for both (1) portfolio managers and (2) "other services" like shareholder services, sub-transfer, etc. (*e.g.,* Loomis Small Cap Growth IS, MFS Mid Cap Value R3, MassMutual Mid Cap Growth R5, and Victory Small Company). "Managed" funds have portfolio managers who charge fees to change the collection of stocks or bonds frequently based on data and other market insights in an attempt to "beat the market." Because of this hands-on approach, they charge extra fees.

47.     The managed funds in the Plan charged Plan participants substantial portfolio manager's fees, 12b-1 fees, sub-transfer agency, and other fees not explicitly stated on prospectuses or the participants' annual notices from the Committee. These were deducted directly from participant's individual accounts with each biweekly payroll deposit without their knowledge as to the actual amounts of those fees and the basis for the charges.

48.     For example, the annual expense fee for the Loomis Sayles Small Cap Value fund was 84 basis points per annum for the N share class and 96 basis points per annum for the I share class of this fund. Thus, about $37,000 in an additional amount was being taken from the workers each year to pay the revenue-sharing credits and the portfolio manager costs of the Loomis Sayles Small Cap fund regardless of whether the portfolio manager covered those costs borne by participants' accounts and whether or not the revenue-sharing credits were rebated to participants.

49.     Participants saving $10,000 into the Committee's more expensive choice paid $96 each year based on the 96 basis points expense ratio (for portfolio manager services and sub-transfer agency credited by the Committee to the recordkeeper/Fidelity).

50.     The Committee had a fiduciary duty to determine whether the substantial additional costs charged by their repeated choice of more expensive classes of funds were justified by realistically evaluated enhanced return expectations that covered those costs. The Committee did not do so.

51.     The Plan did not receive sufficient benefits to justify the inclusion of so many costlier funds.

52.     Nor did the Committee investigate or even consider selecting or transferring assets into lower-cost, better-yielding funds that did not pay such high, hidden investment fees.

53.     Another example of imprudence lies in the Committee's failure to monitor and timely remove Fidelity's Freedom target date funds ("TDF") from the investment menu for many years during the Class Period. This is so even though better performing, lower cost TDFs such as the T. Rowe Price 2005 to 2065 funds were available.

54.     The mean annual return for participants invested in the Fidelity Freedom 2030 was 4.80% per year from 2018 to 2022, as compared to the 5.44% per annum yielded by the T. Rowe Price Retirement 2030 Fund.

55.     Extrapolating the lost opportunity costs from the reckless choice of failing to monitor and remove the Fidelity Freedom target series caused participants to lose opportunity costs in the millions.

56.     A prudent fiduciary would have, over time, observed that Fidelity TDFs were repeatedly trailing the market's performance against their T. Rowe Price TDF peers (and others) while exceeding the comparable funds in costs and, consequently, would have made corresponding adjustments to the Investment Menu or negotiated fee reductions.

57.     Nothing prevented the Committee from performing a diligent annual periodic review in the plan years of 2018 or before to prevent terminated staff from realizing lower levels of cashouts.

58.     A reasonable inference is that if the Committee's plan-wide decision-making was flawed for one investment option, that same flawed decision-making affected every other choice made for the limited participant menu of 28 offerings.

### c.     The Committee Failed to Monitor the Performance of Fund Managers.

59.     The average tenure of portfolio managers is 6.2 years. Failure to monitor the portfolio manager at least every six months can allow an untested and unskilled portfolio manager to cause losses to the trust and participants.

60.     Here, the Committee ignored probable trust income (yields) repeatedly over many years; ignored many types of extra costs that directly reduced participants' returns every business day; ignored their portfolio managers' concentrated and undiversified portfolios (causing additional trust variance and trust risks of losses); ignored their portfolio managers who often and regularly deviated from the investment style they stated in the SEC-prospectus as well as on the Plan's 29 CFR § 2550.404a-5 annual notices; and selected/retained novice, inexperienced portfolio managers who sold every position they bought two years earlier (called "turnover" costs (because they either quit, were fired, or changed their minds)).

61.     An egregious example is the portfolio manager for the Fidelity target date funds. Free 2018 plan year Morningstar® information available at all relevant times to the Committee (required by the Committee's IPS' terms) showed that, when compared to the Fidelity 2030 TDF, the five-year information ratio was higher (*i.e.,* better) for the T. Rowe Price 2030 target date fund over the preceding ten years:

| Name (9/30/17 prospectus data) | Symbol | Category | Category Rank 5-Year | Category Rank 10-Year | Category Rank 15-Year | 5-Year Total | 10-Year Total | 15-Year Total |
|---|---|---|---|---|---|---|---|---|
| *Fidelity Freedom® 2030 (Tops)* | *FFFEX* | *Target-Date 2030* | *26* | *47* | *25* | *55.78* | *56.94* | *225.24* |
| T. Rowe Price 2030 | TRRCX | Target-Date 2030 | 3 | 2 | 1 | 65.04 | 78.24 | 293.35 |

62.     Used in most investment policy statements, "batting average" measures a fund's portfolio manager's ability to beat the relevant market (the SEC-prospectus benchmark). Indeed, returns by the 2030 Fidelity fund manager lagged regularly behind his benchmark while the T. Rowe Price manager did much better against the same benchmark. In 2018, the 15-year "Batting Average" for the Plan's Fidelity 2030 Fund was 40.56%, while the related T. Rowe Price 2030 Fund was 49.44%. Moreover, the Fidelity 2030 fund's Information Ratio over the prior 15-year period was a loss of 55 basis points (-0.55%), while the T. Rowe Price 2030 was significantly less of a loss of 15 basis points (-0.15%).

63.     Another example of imprudence concerns the portfolio manager for the Loomis Sayles Small Cap Value Fund. During the Class Period, the portfolio manager charged a participant with a $50,000 balance about $420 per year, regardless of whether the portfolio manager covered this cost with enhanced returns. The portfolio manager's style attribution deviation explains why his 10-year measurement of portfolio manager value add or skill (to earn their fee taken from participants' daily) was low.

64.     By way of comparison, information was available to the Committee to show the unmanaged S&P SmallCap 600 Value index had an information ratio of 14 basis points over the earlier ten years. The Morningstar® Small Value Index information ratio was 19 basis points and a more blended benchmark, the S&P Small Cap 600 had an information ratio of 21 basis points.

65.     This Loomis Sayles Small Cap's fund's portfolio manager also had only a 47% batting average during the Class Period while his benchmark (Modern Portfolio Theory (MPT) "best-fit"), the Russell 2000 index, posted a 56% batting average, and the S&P 600 small company index average was 51%. The Russell 2000 value index -- its SEC prospectus benchmark -- was 50%.

66.     The batting averages for the prior 15 years available to the Plan Committee showed that their Loomis Sayles Small Cap fund lag was even more dramatic. Prudent, responsible plan fiduciaries, using facts at their fingertips, could have easily understood that retaining this fund was not in the best interests of the Plan or Plan participants.

67.     Facts show the fund's portfolio manager never earned enough return to even cover his fund's annual expense fee. Plan participants, on average, lost 20 basis points each year during the Class Period.

68.     Another example is the T. Rowe Price Blue Chip Growth Fund, which was added to the Plan in 2015. The Blue Chip Growth Fund's portfolio manager is known for a high standard deviation and variance due to a low number of holdings of only 81 stocks (against its broad Russell 1000 and S&P 500 benchmarks). The portfolio manager of the Blue Chip Growth Fund had never proven an ability to consistently and substantially earn his fee each year versus his "appropriate broad-based securities market index." In fact, the Blue Chip Growth Fund portfolio manager lost over 4% per year since 2018 based on the geometric mean.

69.     Moreover, the concentration of holdings in the Blue Chip Growth Fund was massive, as the portfolio manager held 57% of the participants' wage dollars in only ten stocks. This violated the Plan Committees' IPS and ERISA's diversification requirements.

70.    If the Committee had employed a prudent process for monitoring this portfolio manager and investment, it would have noted the lack of skill for this manager by looking at the 10-year information ratio in 2018, which was less than the benchmark (Russell 1000 growth).

71.    Simply stated, the Blue Chip Growth fund should never have been placed on the Plan's investment menu. At the very least, it should have been removed in a timely manner.

72.    The Committee's failure to investigate and monitor the performance of just this one fund's manager caused a loss to the participants from 2018 through the end of 2022 of $18.94 million.

73.    Per the Plan's Investment Policy Statement ("IPS"), the Committee could "add, delete or substitute investment options at any time and for any reason, *subject to the Plan Administrator's responsibility to behave prudently in making such decisions*." (Emphasis supplied.)  The Committee failed in this task.

74.    As the IPS reflects, the Committee, in reviewing, selecting, and monitoring investment options, should have considered Plan objectives, investment style and philosophy, available investment asset classifications, cost-effectiveness (taking into account management style, risk-adjusted return, asset class and other relevant factors), diversification of a fund or strategy's assets (taking into account its intended role in the Plan's investment array) and liquidity. This the Committee did not do.

75.    As the IPS reflects, the Committee, in reviewing, selecting, and monitoring investment options, also should have considered "various characteristics related to each investment maintained under the Plan (such as (among others) investment objectives, risk characteristics, historical performance, expenses, etc.) at such intervals as are prudent, taking into account [such] relevant facts and circumstances … as market conditions, the volatility of the investment in

question, and internal changes in the management of the investment fund or entity." This the Committee did not do.

76.     The IPS required the Committee to "select benchmarks for each of the available investment options in a prudent manner and, if necessary, revise such benchmarks from time to time." This the Committee did not do.

77.     The IPS further required the Committee to "review[] each investment option to determine its performance relative to its benchmark." This the Committee did not do.

78.     With respect to selecting investment managers, the IPS required the Committee to "make such selection after a prudent investigation of the investment manager's qualifications and consideration of other relevant factors, such as the fees to be charged and services to be offered." This the Committee did not do.

79.     In a well-managed plan, failing high-cost funds would have been identified and removed. The lack of these prudent processes repeatedly harmed the Plan and participants.

### d.     The Committee Did Not Monitor Nor Control CapFinancial's Performance and Related Trust Costs.

80.     The duty to evaluate and monitor plan expenses, investments and investment costs, includes fees paid by participants to third party service providers like CapFinancial.

81.     CapFinancial was an excessively compensated and improvident adviser using trust assets (and being paid from trust assets) to service the Plan and received excessive fees for services that were not necessary. Even though it provided identical services to the Tops Plan and Price Chopper Plan prior to their merger, CapFinancial charged Price Chopper Plan participants almost 400% more than Tops Plan participants.

82.     CapFinancial did not provide services that warranted the high fees.

83.     The Committee did not investigate nor monitor whether CapFinancial's services justified its fees.

84.     CapFinancial's payments, authorized by the Committee's poor decision-making from the trust corpus, harmed every participant with an account balance during the putative Class Period.

### 2.     The Committee Failed to Monitor the Plan's Recordkeeping Fees.

85.     The marketplace for large 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion. Large defined contribution plans, like the Plan at issue here, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for the administration of 401(k) plans and the investment of 401(k) assets.

86.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a plan by a plan's "recordkeeper." Beyond providing account statements to participants, it is quite common for the recordkeeper to provide a range of services to a plan as part of a package of services. These services typically include the preparation of individual account statements, delivery of individual account statements, claims processing, and preparation of ERISA-required disclosures to participants and regulators.

87.     Nearly all recordkeepers in the marketplace offer the same range of services. These commoditized services are essentially the same.

88.     At all relevant times, the market for recordkeeping was highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition,

vendors vigorously compete for business by offering the best price rather than differentiating themselves based on the quality or range of services offered.

89.     ERISA explicitly requires plan fiduciaries to prudently defray plan expenses. 29 U.S.C. 1104(a)(1)(A). Accordingly, prudent fiduciaries routinely bargain for low recordkeeping fees. This is especially so given that individual plan participants cannot negotiate with recordkeepers on behalf of the Plan.

90.     The cost of providing recordkeeping services primarily depends on the number of participants in a plan, rather than the range of services provided to the plan. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis. Plans with large numbers of participants can and do take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

91.     Recordkeeping expenses can either be paid directly from plan assets and/or indirectly by the plan's investments in a practice known as "revenue sharing."

92.     Revenue sharing payments are derived from investments within a plan, typically mutual funds. A percentage of all the money invested by plan participants in mutual funds is removed from the plan participants' investments daily and the extra costs reduce the NAV (net asset values) of the participants' funds (reduce NAVs allocated later to individual bookkeeping accounts). Via a service agreement, the Committee directs these dollars to be diverted to the plan's recordkeeper. Often then, the Committee ensures they never receive an administrative bill and the employees never see a related payment transaction for administration on their account statements. The money taken from Plan participants via revenue sharing is not disclosed in a dollar amount, percentage, or any other meaningful way on any account statements or other documents provided to Plan participants.

93.     Fees obtained through revenue sharing are not tied to any actual services provided to a plan; rather, such fees are based on a percentage of participants' assets in a plan and/or investments in mutual funds in a plan. As the assets in a plan increase, due primarily to employee biweekly contributions, so do the recordkeeping fees that the recordkeeper pockets.

94.     When revenue sharing is left unmonitored, as here, it can be devastating for plan participants. This is especially so where, as here, Plan fiduciaries lead participants to believe that the Plan is free when it actually can be quite expensive. Fees increase with periodic contributions, interest, dividends, etc., but services stay exactly the same as agreed upon in the services agreement by the Committee and the recordkeeper. Fidelity has been the recordkeeper for Tops since at least January 1, 2009.

95.     Prudent fiduciaries implement three related processes to manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, they must identify all fees, including direct and indirect compensation through revenue sharing, being paid to the Plan's recordkeeper. Third, they must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. The Committee did not implement any of these processes.

96.     At all relevant times, Fidelity served as recordkeeper for the two Tops Plans. Its fees included both revenue sharing (indirect compensation) and direct compensation.

97.     Looking at Fidelity's compensation compared to recordkeeping costs for other plans of a similar size shows that the Plan was paying significantly higher fees than its peers – an

indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.

98.     For example, Fidelity acts as the recordkeeper for Molson Coors Beverage Company USA, LLC ("Molson Plan"). The Molson Plan filed a Form 5500 disclosure for the year ending 2021 that shows it had 2,850 plan participants (with account balances) $476,920,040 of assets under management in the plan. The plan's participants paid $20.36 per participant annually for non-investment management fees (recordkeeping). This plan's total direct fees came in at 0.28%. Based on the matching Molson's and the Defendants' Form 5500 Service Codes, the services Fidelity provides to the Molson Plan are virtually identical to those it provides to each Plan here.

99.     However, the Tops 401k direct "asset-based" fees were twice as high. Asset-based means Fidelity gets paid more money every time (1) participants save more biweekly wages into their accounts, (2) when the participants' dividends/interest post to their accounts or (3) when the participants' biweekly matching dollars are deposited, etc.

100.     Tops non-union plan's total fees were over twice as high at 0.59% and over five times higher ($118.18) on a "per participant" or per capita basis for recordkeeper costs. Based on the certified Forms 5500 and certified financial statements (i.e., balance sheets, income statements and independent audits) Tops' union plan costs their union workers 0.52% for every wage dollar saved in total direct fees or $109.34 per annum per participant.

101.     The recordkeeping fees paid to Fidelity were far more significant than recognized reasonable rates for similarly sized plans. For example, Tops' peers' plans cost (in 2021) much less: Giant Eagle, Inc.: 0.23% in total fees; MNS, Ltd.: 0.31%; Stew Leonard's: 0.32%; and Giant of Maryland LLC: 0.41%.

102.     The merged Golub Corporation's Price Chopper plan came in at the midpoint of the two Tops plans at 0.55% (Principal was the recordkeeper in 2021, the year the agreement to merge was reached).

103.     But it gets worse. As noted above, Fidelity received not only direct compensation from the Plan, management fees and "Other compensation" listed in Fidelity's funds' SEC-prospectus, it also received non-Fidelity funds' revenue sharing payments. In fact, some non-Fidelity prospectuses indicated Fidelity may have received placement or finder's fees. Moreover, based on Fidelity's funds' SEC prospectuses, Fidelity kept their securities lending revenue (instead of returning it to investors like Vanguard's funds' investors).

104.     The Committee did not investigate alternatives to revenue sharing to make sure that the amount of compensation paid for recordkeeping was tied to the actual services provided and to make sure that those fees would not unfairly increase based upon an increase in assets in the Plan. For example, the Committee did not explore paying for recordkeeping services based on a flat per-participant account price tied to the number of participants in a plan.

105.     Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace, upon information and belief, the Plan could have obtained recordkeeping services that were comparable to the exact same services that were being provided to the Plan by Fidelity at fifty percent (50%) or lower costs based on the three plans' Forms 5500.

106.     The Committee's flawed decision-making process caused the Plan and its participants to pay more excessive annual compensation to Fidelity.

107.    By way of example, Forms 5500 prove participants buying the Victory Small Company Fund, with 75 basis points in revenue-sharing, paid 50% more for precisely the same plan administrative costs than participants buying the MFS Mid Cap Value R3 (at 50 basis points).

108.    The Committee violated (1) common trust law and (2) its statutory duty to defray Plan expenses. The Committee engaged in little to no examination, comparison, or benchmarking of the recordkeeping/administrative fees of the Plan to those of other similarly sized 401(k) plans. Also, it was complicit in paying grossly excessive fees.

109.    Had the Committee conducted a meaningful examination, comparison, or benchmarking, as any prudent fiduciary would, it would have known that the Plan was compensating Fidelity at an inappropriate level. Plan participants bear this excessive fee burden and, accordingly, achieve considerably lower retirement savings since the extra fees, particularly when compounded, have a damaging impact on the returns attained by participant retirement savings.

110.    By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, the Committee breached its fiduciary duties to the Plan.

111.    The Committee failed to monitor, control, negotiate, and otherwise ensure that indirect compensation Plan participants paid to Fidelity was not excessive and unreasonable.

112.    Unlike a prudent fiduciary, the Committee failed to track Fidelity's expenses by, for example, demanding documents that summarize and contextualize its compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

113.    The Committee failed to closely monitor the amount of the payments to ensure that Fidelity's total compensation from all sources did not exceed reasonable levels. Nor did the Committee require that excess revenue sharing payments to be returned to the Plan and its participants.

114.    At the time the Committee selected and thereafter retained Fidelity as recordkeeper, other recordkeepers on the market provided services comparable or superior to Fidelity's at a lower cost.   But the Committee also failed to solicit and procure bids from other recordkeepers at any time since 2009, let alone during the Class Period or at regular intervals.

115.    Had the Committees solicited and procured bids to compare Fidelity's compensation with those of others in the marketplace, it would have recognized that Fidelity's compensation during the Class Period was (and remains) unreasonable and excessive.

116.    Tops non-union Plan's total recordkeeping fees were 0.59% in 2021. Given the average participant balance in 2021 was $159,533, they paid an average of $941.24 in costs because almost all costs were tied to how large of an account each worker had at the time Fidelity's fees were taken.

117.    The Tops non-union plan's 2018 fee at fifty-nine basis points equaled $650.59 on the participant's average Form 5500 balance of $110,270—but it rose by 10% to $720.44 in 2019 for the same services (average participant balance was $122,108). In 2020, the fees were $813 for the same services and in 2021, they were $941 (on a participant's average balance of $159,533) or a 30% increase for no added services.

118.    The size of its assets and the number of participants qualified the Plan for lower-cost recordkeeping services.   At the very least, the Plan, at all relevant times, had substantial bargaining power to negotiate its expenses incurred from various fees.

119.     Given that the services that Fidelity provided were standard, a prudent fiduciary would have observed the excessive compensation being paid to Fidelity and taken corrective action.

120.     In short, the Committee was required but failed to (a) consider the revenue sharing paid to and kept by Fidelity, (b) determine whether Fidelity's total compensation was reasonable, and (c) determine whether the arrangement for Fidelity to keep the revenue sharing was acceptable.

121.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7; see also 29 U.S.C. § 1104(a)(1)(A) (requiring ERISA fiduciaries to "defray reasonable expenses of administering the plan."). This the Committee failed to do.

**B.      The Committee Breached Its Duty of Loyalty.**

122.     The Committee violated its fiduciary duty to act exclusively in the interests of the Plan and Plan participants.

123.     The Committee repeatedly sought open-ended investment company revenue-sharing dollars for their benefit. Instead of receiving an invoice from the recordkeeper the sought-after revenue-sharing compensation could be directed to Fidelity and other covered service providers. They decided what rebates were kept by providers and what was left to be credited to participants' accounts (usually three to six months after the affected participants' revenue-sharing deductions).

124.     The Committee's use of revenue-sharing in this 401(k) reduced participants' balances daily (by decreasing net asset values (reduced trust asset pricing to participants (NAV)). The use of applying credits to participants also cost participants more than the revenue-sharing

credits could ever make up due to lost compounding from the open-ended investment company taking revenue-sharing from participants' earnings daily at 4 p.m.

125.    In other words, the Committee repeatedly sought open-ended investment company revenue-sharing dollars for their benefit. Instead of receiving an invoice from the recordkeeper, the sought-after revenue-sharing compensation could be directed to Fidelity and other covered service providers. The Committee decided what rebates were kept by providers and what was left to be credited to participants' accounts (usually three to six months after the affected participants' revenue-sharing deductions).

126.    One egregious example is the Committee's having sought revenue sharing credits of 15 basis points on $6,617,703 invested by participants in the Blackrock Total Return Fund in 2022. The Committee selected this investment, knowing it would receive revenue-sharing equal to about $10,000 annually recurring if they could convince participants to move their wages into the fund. The Committee's conflicted interests repeatedly caused more harm than this arithmetic 15 basis points because investment losses are compounded over time. As such, the lost opportunity costs rise commensurately.

127.    The Committee's interest in finding and receiving mutual fund and collective fund non-pecuniary revenue credits, deducted from participants' investment dollars each calendar day, overwhelmed their desire to seek out the lowest risk and highest potential returns for their participants.

128.    Another example of disloyalty is when the Committee directed each participant's interest in the 2013 Fidelity Diversified International Fund to be sold and the option removed from the Tops non-union Plan ($10,353,804). The Committee then directed that the resulting cash be placed into its newly chosen international Dodge & Cox International Fund. Since 2014, the

Committee has received revenue-sharing credit dollars for each wage dollar saved biweekly into the Dodge & Cox International Fund investment option. The 2022 Form 5500 indicates this fund held $7.2 million of participants' money.

129.   The Committee was addicted to finding and using revenue sharing credits that benefit each Plan's sponsoring corporation while failing to do the math related to the compounded harm caused by these same actions.

130.   By selecting high-cost investments with revenue sharing so that it could use a portion of the fees to pay inflated fees to Fidelity, the Committee acted to save itself at the expense of Plan participants and/or to favor its recordkeeper over the Plan participants and the trust.

131.   The Committee, if it had exercised any modicum of reasonable due diligence, knew, or should have known, about the excessive nature of these fees at all pertinent times. The Committee could have achieved these enormous cost savings throughout the Class Period, based upon a cursory examination of the marketplace for defined contribution products, but chose not to look or, instead, to ignore the manner in which the Plan participants were having their retirement savings slowly eroded *en masse* by excessive fees.

## VI. CLASS ALLEGATIONS

### A.   Class Action Allegations

132.   Plaintiffs bring this action on their own behalf and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following Class: participants and beneficiaries of the Plan from January 1, 2018 through the date of judgment, excluding Defendants and (a) any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Northeast Grocery, Tops, or Price Chopper or is or was a partner, officer, director, or controlling person of Northeast Grocery, Tops, or Price Chopper; (b) the spouse or children of any individual

who is an officer, director or owner of 5% or more of the equity of Northeast Grocery, Tops, or Price Chopper; (c) Plaintiffs' counsel; (d) judges of the Court in which this case is pending and their current spouse and children; and, (e) the legal representatives, heirs, successors and assigns of any such excluded person.

133.   The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are capable of common answers as those issues primarily focus on Defendants' acts. The common issues include whether Defendants breached fiduciary duties to the Plan and Plan participants, whether Defendants engaged in prohibited transactions, and the appropriate relief for Defendants' violations of ERISA.

134.   Plaintiffs' claims are typical of the claims of other members of the Class because their claims arise from the same events, practices and/or courses of conduct described above.

135.   Plaintiffs' claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

136.   Plaintiffs will fairly and adequately represent and protect the interests of the Class.

137.   Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class.

138.   Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

29

139.    Plaintiffs are represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty and ERISA prohibited transactions.

140.    The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

141.    The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants engaged in prohibited transactions with respect to the Plan and fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

142.    The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive appropriate with respect to the Class as a whole. This action challenges whether Defendants engaged in prohibited transactions, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants engaged in prohibited transactions or breached their

fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

143.    The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants engaged in prohibited transactions or breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

144.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result inconsistent judgments about Defendants' duties with regard to the Plan.

145.    The following factors set forth in Rule 23(b)(3) also support certification:

a. The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b. No other litigation concerning this controversy has been filed by any other members of the Class.

c. This District is the most desirable location for concentrating this litigation because (i) Northeast Grocery is located in this District; (ii) the Plan is administered in this District; (iii) one or more Defendants are located in this District; (iv) a significant number if not the majority of the Class members are located in this District, and (v) a number of the witnesses, including a number of relevant non-party witnesses, are expected to be located in this District.

d. There are no anticipated difficulties in managing this case as a class action.

**B. Timeliness**

146.     Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation ...." 29 U.S.C. § 1113.

147.     Even after making initial investment decisions, the Committee had (and still has) a duty to continue to monitor the Plan investments and remove imprudent ones. This duty required them to systematically consider all Plan investments at regular intervals to ensure the investments were appropriate. So long as the alleged breach of the continuing duty occurred within six years of suit, as here, the claim is timely.

148.     The continuing duty doctrine applies to "monitoring and reviewing" duties even with respect to Investment Funds placed into the Plan more than six years before the filing of the lawsuit if, as here, they remained in the Plan during ERISA's six-year limitation period. Therefore, the Class includes any Plan participant who held imprudent funds during the six-year period,

regardless of when those funds were added to the Plan. The Class also includes those participants who suffered damages prior to six years from filing of this action as the Committee had a duty to repair and make whole the participants' losses during the six-year period.

149. The continuing duty doctrine applies to "monitoring and reviewing" CapFinancial and Fidelity, all of whom provided advice or other services within six years of the filing of this action.

150. At all relevant times during the Class Period, Defendants made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

151. The Committee also intentionally failed to provide adequate disclosures to participants in the Plan regarding the fees and expenses charged to them by investment funds and third-party providers. The Committee failed to properly identify fees and expenses charged against participants' individual accounts and failed to properly identify the source of the fees and expenses so charged.

152. At all relevant times, management fees and operating were deducted directly from Plan participant individual accounts. However, such deductions were not separately reflected in any disclosures to Plan participants. Consequently, participants did not know how much was deducted from their individual accounts for such fees.

153. Under 29 C.F.R. § 2550.404a-5, the Plan administrator "must take steps to ensure … that such participants and beneficiaries, on a regular and periodic basis, are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and expenses

attendant thereto, to make informed decisions with regard to the management of their individual accounts."

154.     The information provided in such disclosures must be "complete and accurate." *Id* 29 C.F.R. § 2550.404a-5(c)(2)(i)(A). This duty also requires the Plan Administrator to make affirmative disclosures when it knows that silence might be harmful.

155.     In addition, the Plan administrator must provide to each plan participant "an explanation of any fees and expenses for general plan administrative services (*e.g.,* legal, accounting, recordkeeping), which may be charged against the individual accounts of participants and beneficiaries . . . ." 29 C.F.R. § 2550.404a-5(c)(2)(i)(A).

156.     At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches and prohibited transactions to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

157.     In this case, Defendants had and have an ongoing duty to rectify its deficiencies and make whole losses that create a continuing duty and ongoing breaches, or alternately tolls the statute. As such, the Class Period will ultimately begin when the Plan began committing the breaches described herein, as the damages continued and should have been repaired during the six-year period.

158.     Because Defendants affirmatively concealed the violations of ERISA alleged in this Complaint and their participation in them, and because Plaintiffs did not acquire actual knowledge of these violations until 2023, within three years of the filing of this action, Plaintiffs' claims in this action are timely.

### COUNT 1: Violation of 29 U.S.C. § 1104(a)(1)(B)
### (against the Committee and John Does 1-30)

159.     Plaintiffs re-allege and incorporate in Count 1 paragraphs 1-121 and 132-158 of the

Complaint.

160.    At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

161.    ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

162.    As fiduciaries of the Plan, Defendants were subject to the duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aim.

163.    At all relevant times during the Class Period, Defendants breached their fiduciary duty of prudence in multiple respects as discussed above.

164.    Based on reasonable inferences from the facts set forth in this Amended Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure, among other things, that: (a) participants in the Plan were being charged appropriate and reasonable fees for the Plan's third-party service providers; (b) their selection and retention of investment options were prudent; and (c) Plan expenses were reasonable and necessary.

165.    At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best

interests of the Plan participants. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

166.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

167.    In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

### COUNT 2: Violation of 29 U.S.C. § 1104(a)(1)(A)
### (against the Committee and John Does 1-30)

168.    Plaintiffs re-allege and incorporate in Count 2 paragraphs 1-121 and 132-158 of the Complaint.

169.    At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

170.    ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." *Id.*

171.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

172.    "Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

173.    At all relevant times during the Class Period, Defendants breached their fiduciary duty of loyalty in multiple respects as discussed above.

174.    As a direct and proximate result of their breaches of this fiduciary duty, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

175.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

176.    In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

## COUNT 3: Violation of 29 U.S.C. § 1105
### (against the Committee and John Does 1-30)

177.    Plaintiffs re-allege and incorporate in Count 3 paragraphs 1 through 158 of the Complaint.

178.    ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach;

(B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach.

179.    Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT 4:  Violation of 29 U.S.C. § 1104(a)(1)(B)
### (against Northeast Grocery)

180.    Plaintiffs re-allege and incorporate in Count 4 paragraphs 1 through 158 of the Complaint.

181.    Defendant is the Plan Sponsor as defined by ERISA. Defendant appointed individuals to serve on the Committee. Committee members served as fiduciaries of the Plan and at the discretion of Defendant. Defendant, at all relevant times, was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

182.    Defendant, as the appointing fiduciary, had a duty to monitor the Committee at regular intervals to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

183.    Defendant also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and

38

information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

184.    Defendant breached its fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the Plan's expenses and investments were evaluated; and (c) failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

185.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

186.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT 5: Violation of 29 U.S.C. § 1106(a)**
**(against the Committee and John Does 1-30)**

187.    Plaintiffs re-allege and incorporate in Count 5 paragraphs 1 through 158 of the Complaint.

188.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or

should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

189.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

190.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

191.    Each of Defendants is or was both a fiduciary and a party-in-interest subject to ERISA § 406(a)(1)(C), (D).

192.    The Committee's inclusion of and failure to remove the imprudent funds in the Plan described above amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

193.    To the extent any of them are not fiduciaries, Defendants, as parties-in-interest, may be held liable for knowing participation in these violations of ERISA §§ 406(a)(1)(C) and (D) pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) regardless of whether they were ERISA fiduciaries.

194.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

### COUNT 6: Violation of 29 U.S.C. § 1106(b)
### (against the Committee and John Does 1-30)

195.     Plaintiffs re-allege and incorporate in Count 6 paragraphs 1 through 158 of the Complaint.

196.     ERISA § 406(b), 29 U.S.C. § 1106(b), provides: "A fiduciary with respect to a plan shall not— (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

197.     Each of Defendants is or was both a fiduciary and a party-in-interest subject to ERISA § 406(b).

198.     Defendants violated each of the above prohibited transaction rules. Their inclusion of and failure to remove the imprudent funds from the Plan described above resulted from the their "deal[ing] with the assets of the plan in [their] own interest or for [their] own account" in violation of ERISA § 406(b)(1), "act[ing] in any transaction involving the plan on behalf of a party ... whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries" in violation of ERISA § 406(b)(2), and "receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

199.    At all relevant times during the Class Period, Defendants each acquired valuable consideration as a result of the investment options recommended, selected, and retained in the Plan and as a result of the revenue sharing agreements among them.

200.    Among this consideration was rebates of Plan expenses which belonged to Plan participants, as well as portions of participant contributions they individually retained for their own benefit.

201.    No notes on the audited trust financials showing an intent to restore the participants' accounts for excessive CapFinancial payments from their accounts over earlier years for CapFinancial's unnecessary services.

202.    Moreover, credits were regularly retained by Fidelity for many months as it took cuts or payments from the pool of money (controlled by the Committee). As a result of this delay, participants' money value eroded over time.

203.    Defendants additionally engaged in self-interested transactions insofar as they profited from the management of Plan assets to the detriment of the Plan, its participants, and beneficiaries, and entered into agreements under which the Plan paid unreasonable fees and expenses.

204.    The Committee engaged in prohibited transactions by selecting the imprudent funds to earn profit for Fidelity and CapFinancial at the expense of Plaintiffs' retirement investments through revenue sharing and kickback arrangements.

205.    Defendants failed to inform participants adequately of the risks of investing in the managed funds, and that the funds charged substantially higher fees than "readily available and comparable fund options.

206.    In doing so, Defendants dealt with the assets of the Plan in their own interest and/or for their own account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

207.    In doing so, Defendants also acted adverse to the interests of the Plan and Plan participants in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

208.    And in doing so, Defendants each received consideration for their personal account from a party dealing with the Plan, in a transaction involving the assets of the Plan, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

209.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(b).

## COUNT 7: Breach of Fiduciary Duty by Omission
### (against all Defendants)

210.    Plaintiffs restate and incorporate in Count 7 paragraphs 1 through 158 of the Complaint.

211.    As fiduciaries of the Plan with the powers to bring actions on behalf of the Plan, Defendants had the ability to bring actions on behalf of the Plan pursuant to ERISA § 502(a)(2) and ERISA § 502(a)(3) at all relevant times during the Class Period.

212.    Among the assets of an employee benefit plan under ERISA is a "chose in action" – the right to bring an action to recover a debt, money or a thing – including to institute a lawsuit for a breach of fiduciary duties or other violations. ERISA fiduciaries are prohibited from engaging in transactions under ERISA § 406(a) or 406(b) unless there is an exception or exemption, and a claim can be brought on behalf of the Plan against an ERISA fiduciary who engages in such prohibited transactions.

213.    As a result, one of the assets of the Plan was a claim against Defendants for engaging in prohibited transactions for their own benefit as set forth in this Complaint.

43

214.    By virtue of the power pursuant to the Plan, Defendants had the authority to institute a claim against Defendants for engaging in prohibited transactions for their own benefit as set forth in this Complaint.

215.    Each of them either knew or through a proper review would have discovered that the other Defendants engaged in prohibited transactions in violation of ERISA as set forth in this Complaint, because each of them had knowledge of the terms of these self-dealing transactions, or through a prudent and loyal investigation in their role as Plan fiduciaries would have discovered them.

216.    Defendants did not take any action, including any legal action, or exercised any other authority under the Plan or the Trust Agreement, to properly manage this choice in action.

217.    By failing to remedy these prohibited transactions on behalf of the Plan, including by, if necessary, bringing suit against Defendants through the present, Defendants violated ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A).

218.    Because their fiduciary duties included employment of legal advisors, Defendants failed to comply with ERISA § 404(a)(1) in the administration of their specific responsibilities as fiduciaries, and this failure enabled the other Defendants to violate ERISA in their acquisition of unreasonable fees and Plan assets.

219.    As a direct and proximate result of these breaches by Defendants, the Plan suffered losses and/or Defendants obtained profits that rightfully belong to the Plan and its participants.

220.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered millions of dollars in losses.

221.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of omission.

222.   Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

## VII. ENTITLEMENT TO RELIEF

223.   By virtue of the violations described above, Plaintiffs and the Class are entitled to sue each of the Defendants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

224.   By virtue of the violations described above, Plaintiffs and the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue each of the Defendants for any appropriate equitable relief to redress the wrongs described above.

## VIII. PRAYER FOR RELIEF

Wherefore Plaintiffs, on behalf of themselves and the Class, pray that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint Paul J. Sharman, Esq. of The Sharman Law Firm LLC as Class Counsel;

B. Declare any transaction that constitutes a prohibited transaction void and (1) require each fiduciary and party-in-interest engaging in these transactions) to disgorge any profits made as a result of such transaction; (2) declare a constructive trust over the proceeds of any such transaction; or (3) order any other appropriate equitable relief, whatever is in the best interest of the Plan.

C. Require that the proceeds of any recovery for the Plan be allocated to the accounts of participants in the Plan, other than the Defendants and other individuals excluded from the Class.

D. Order the removal of the members of the Committee from their positions as fiduciaries of the Plan and enjoin them from acting as fiduciaries for any employee benefit plan that covers or includes any Northeast Grocery employees or any members of the Class.

E. Appoint an Independent Fiduciary to manage the Plan to be paid for by Defendants.

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiffs and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability.

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action.

H. Award pre-judgment and post-judgment interest.

I. Award any other such relief the Court determines Plaintiffs and the Class are entitled to pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).

Dated:  January 9, 2024

                                    **LAW OFFICES OF PETER W. TILL**

                                    */s/ Peter W. Till*
                                    Peter W. Till, Esquire

                                    N.J. Bar ID: 002101974

                                    105 Morris Avenue
                                    Springfield Township, NJ
                                    Email: pwt@till-law.com
                                    Phone: (973) 258-0064

**THE SHARMAN LAW FIRM LLC**

*/s/Paul J. Sharman*
PAUL J. SHARMAN (*pro hac vice* to be filed)

Georgia State Bar No. 227207

The Sharman Law Firm LLC
11175 Cicero Drive, Suite 100
Alpharetta, GA 30022
Email: paul@sharman-law.com
Phone: (678) 242-5297
Fax: (678) 802-2129