UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GAIL COLLINS, DEAN DEVITO,
MICHAEL LAMOUREUX, and SCOTT
LOBDELL, individually and on behalf
of the Northeast Grocery, Inc. 401(k)
Savings Plan and on behalf of similarly
situated participants and beneficiaries
of the Plan,

                Plaintiffs,

         -v-                 5:24-CV-80

NORTHEAST GROCERY, INC., THE
ADMINISTRATIVE COMMITTEE OF
THE NORTHEAST GROCERY, INC.
401(K) SAVINGS PLAN, and JOHN
AND JANE DOES 1-30 in their
capacities as members of the
Administrative Committee,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:             OF COUNSEL:

THE SHARMAN LAW FIRM LLC     PAUL SHARMAN, ESQ
Attorneys for Plaintiffs
11175 Cicero Drive, Suite 100
Alpharetta, GA 30022

LAW OFFICES OF PETER W. TILL    PETER W. TILL, ESQ
Attorneys for Plaintiffs
105 Morris Avenue, Suite 201
Springfield, NJ 07081

HARTER, SECREST & EMERY LLP
Attorneys for Defendants
50 Fountain Plaza, Suite 1000
Buffalo, NY 14202-2293

FRANCO A. MIROLO, ESQ.
MICHAEL-ANTHONY JAOUDE,
  ESQ.
ERIKA N.D. STANAT, ESQ.

DAVID N. HURD
United States District Judge

## **DECISION and ORDER**

## I. **INTRODUCTION**

On January 17, 2024, Gail Collins ("Collins"), Dean DeVito ("DeVito"), Michael Lamoureux ("Lamoureux"), and Scott Lobdell ("Lobdell") (collectively "plaintiffs") brought this putative class action individually and on behalf of the Northeast Grocery 401(k) Plan against Northeast Grocery, Inc. ("Northeast Grocery"), and the Administrative Committee of the Northeast Grocery 401(k) Plan (the "Committee")[1] (collectively "defendants").  Dkt. No. 1.  Plaintiffs' seven-count complaint alleges that defendants, in their administration of the Northeast Grocery 401(k) Plan, breached their fiduciary duties and committed other violations of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.  Id.*

On March 4, 2024, defendants moved to dismiss plaintiffs' complaint pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6).

---

[1]  Plaintiffs have also named John and Jane Does 1-30, in their capacities as members of the Committee, as defendants.  *See* Dkt. No. 1.  For the sake of brevity, these defendants will be referred to as part of the "Committee."

Dkt. No. 10.  The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II.  BACKGROUND

### A.  Statutory Background

In 1974, ERISA was enacted with the central purpose of protecting the "interests of participants in employment benefit plans," including retirement plans.  29 U.S.C. § 1001(b).  To further this purpose, ERISA establishes standards of conduct, responsibilities, and obligations for plan fiduciaries.  *See id.*  ERISA authorizes plan participants to bring civil actions against plan fiduciaries who breach their duties to a retirement plan.  *See id.* §§ 1109(a), 1132(a)(2).  In doing so, plan participants may seek relief to recover benefits due to them under the terms of the retirement plan.  *Id.* § 1132(a)(1)(B).

### B.  Factual Background

In February 2008, Northeast Grocery established the Tops Market, LLC 401(k) Savings Plan (the "Tops Plan").  Compl. ¶¶ 7–8.  The Tops Plan was established to provide retirement benefits to eligible employees of Northeast Grocery, and its participating affiliates, through the long-term accumulation of retirement savings.[2]  *Id.* ¶ 8.

---

[2]  The Tops Plan covered substantially all non-union and union employees of Tops Markets, LLC, Tops PT, LLC, and Erie Logistics (collectively "Tops").  Compl. ¶¶ 8–9.

In November 2021, Tops merged with the Golub Corporation, the owner of Price Chopper Supermarkets ("Price Chopper"). Compl. ¶ 8. As part of this transaction, Price Chopper's retirement plan, the Price Chopper Associate 401(k) Plan (the "Price Chopper Plan"), merged into the Tops Plan. *Id.* The resulting retirement plan was renamed the Northeast Grocery 401(k) Plan (the "Plan"). *Id.*

The Plan is a defined-contribution retirement plan. Compl. ¶ 7. As such, plan participants direct their retirement assets into a menu of twenty-eight investment options. *Id.* ¶ 10. Each of these investment offerings are pre-selected by the Committee. *See id.* ¶¶ 20, 22. Members of the Committee are appointed by Northeast Grocery. *Id.* ¶ 20. CapFinancial Partners, LLC ("CapFinancial") serves as the Plan's financial advisor and investment manager. *Id.* ¶ 14. Fidelity Management ("Fidelity") serves as the Plan's recordkeeper. *Id.*

Plaintiffs Collins, DeVito, and Lobdell are employees of Price Chopper and plan participants of the Price Chopper Plan. Compl. ¶¶ 15–17. Plaintiff Lamoureux is an employee of Tops and a plan participant of the Tops Plan. *Id.* ¶ 18. Plaintiffs allege that they suffered financial losses as a result of defendants' mismanagement of the Plan and violations of ERISA. *Id.* ¶¶ 15–18. Specifically, plaintiffs assert that defendants breached their fiduciary

duties and engaged in prohibited transactions by failing to prudently select and monitor Plan investments and seeking open-ended investment company revenue sharing dollars for their own benefit. *See id.* ¶¶ 22–131.

### III. <u>LEGAL STANDARD</u>

#### A. <u>Rule 12(b)(1)</u>

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)). "Subject matter jurisdiction is a threshold issue and, thus, when a party moves to dismiss under both Rules 12(b)(1) and 12(b)(6), the motion court must address the 12(b)(1) motion first." *Brokamp v. James*, 573 F. Supp. 3d 696, 703 (N.D.N.Y. 2021), *aff'd*, 66 F.4th 374 (2d Cir. 2023) (citing *Hartwick v. Annucci*, 2020 WL 6781562, at *4 (N.D.N.Y. Nov. 18, 2020)).

#### B. <u>Rule 12(b)(6)</u>

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the level of speculation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). So,

while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## IV. <u>DISCUSSION</u>

Plaintiffs' seven-count complaint sets forth claims for violation of the fiduciary duty of prudence against the Committee (Count I), violation of the fiduciary duty of loyalty against the Committee (Count II), co-fiduciary liability against the Committee (Count III), violation of the fiduciary duty to monitor against Northeast Grocery (Count IV), prohibited transactions against the Committee (Counts V and VI), and violation of the fiduciary duty by omission against all defendants (Count VII). Compl. ¶¶ 159–222.

Defendants seek dismissal of plaintiffs' complaint in its entirely for lack of standing pursuant to Rule 12(b)(1) and failure to state a claim pursuant to Rule 12(b)(6).  Defs.' Mem., Dkt. No. 10-1 at 13–31.[3]  Plaintiffs' standing to bring each of their claims will be addressed first before turning to the merits of their claims.

## A.  Standing

First, defendants argue that plaintiffs do not have standing to challenge the Committee's alleged mismanagement of funds that they did not invest in because they cannot demonstrate a cognizable injury in fact stemming from the Committee's conduct related to those funds.  Defs.' Mem. at 13–15.

Article III of the U.S. Constitution "limits the subject-matter jurisdiction of the federal courts to 'Cases' and 'Controversies.'"  *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) (citing *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019)).  "The standing doctrine, which emerges from Article III, is designed 'to ensure that federal courts do not exceed their authority as it has been traditionally understood.'"  *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

"The Supreme Court has established that the irreducible constitutional minimum of standing consists of three elements."  *N.Y. State Corr. Officers &*

---

[3]  Pagination corresponds to CM/ECF header.

*Police Benevolent Ass'n, Inc. v. Hochul*, 607 F. Supp. 3d 231, 238 (N.D.N.Y. 2022) (cleaned up).  "[T]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *SM Kids, LLC*, 963 F.3d at 211 (cleaned up).

Plan participants bringing suit under ERISA do not automatically satisfy the injury in fact component of standing simply because the statute provides them with a cause of action to seek recovery on behalf of a retirement plan for losses to the plan.  *Thole v. U. S. Bank N.A*, 590 U.S. 538, 544 (citing *Spokeo, Inc.*, 578 U.S. at 341).  Instead, plan participants must show that their *individual* accounts suffered a loss due to an ERISA violation.  *See Antoine v. Marsh & McLennan Cos., Inc.*, 2023 WL 6386005, at *6 (S.D.N.Y. Sept. 30, 2023) (noting that plan participants are required to demonstrate a loss that affected their personal accounts or receipt of benefits due to them); *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *10 (S.D.N.Y. Aug. 2, 2021) (concluding that plan participants can seek relief on behalf of a plan "only for mismanagement that caused injury to them as individual participants").

Plan participants may demonstrate an injury to their individual accounts by showing that a fund they invested in had excessive fees and/or diminished returns relative to an available alternative investment, thereby implicating a

- 8 -

financial loss in comparison to what they might have received but for the ERISA violation. *Bekker v. Neuberger Berman Grp. LLC*, 2018 WL 4636841, at *4 (S.D.N.Y. Sept. 27, 2018) (citation omitted); *see also Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 159 (E.D.N.Y. 2022) (noting that financial losses can support a cognizable injury regardless of whether there was an actual loss on an investment or simply a more modest gain).  In the alternative, plan participants may establish an injury to their individual accounts by showing that plan-wide mismanagement, unrelated to specific funds, caused all plan participants' individual accounts to suffer a financial loss. *See Garthwait v. Eversource Energy Co.*, 2021 WL 4441939, at *7 (D. Conn. Sept. 28, 2021) (hereinafter "*Garthwait I*") (finding allegations that plan-wide mismanagement caused all plan participants to be charged with excessive recordkeeping fees sufficient to show a cognizable injury).

Broadly speaking, plaintiffs allege that the Committee violated ERISA by failing to maintain a prudent process for administering the Plan and act in the exclusive interest of plan participants.  Compl. ¶¶ 22–131.  As evidence of the Committee's failure to do so, plaintiffs draw attention to the Committee's alleged mismanagement of certain funds.  *See id.*  In plaintiffs' view, it can be plausibly inferred from the Committee's mishandling of these funds that the Committee's overall process for managing the Plan was flawed.  *See id.*

Defendants argue that plaintiffs' claims, to the extent they challenge the Committee's mismanagement of funds that they did not invest in, must be dismissed for lack of standing.  Defs.' Mem. at 9, 13–15.  Defendants assert that such a finding is warranted because plaintiffs have not shown that they were injured by the Committee's alleged mishandling of these funds.  *Id.*  In making this argument, defendants rely on the fact that the Plan at issue here is a defined-contribution plan.  *See id.* at 13–14; Defs.' Reply, Dkt. No. 14 at 6–7.  Relevant here, participants of a defined-contribution plan decide how their contributions will be invested "by selecting from a variety of investment options offered by the plan."  Defs.' Reply at 6; *see also Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 265 (S.D.N.Y. 2023).  It follows that the gains or losses in a plan participant's account "are tied specifically to the particular funds in which the participant has chosen to invest."  Defs.' Reply at 6; *see also Singh*, 650 F. Supp. 3d at 265.  Thus, defendants contend that plaintiffs could not have been injured by the alleged mismanagement of funds that they did not personally invest in.  Defs.' Reply at 7.

**1.  <u>Duty of Prudence</u>**

Plaintiffs first reference the mismanagement of specific funds in their claim for violation of the fiduciary duty of prudence.  *See* Compl. ¶¶ 22–121, 159–167.  There, plaintiffs allege that the Committee breached its duty of

prudence by failing to: (1) investigate the availability of alternative share classes; (2) investigate the availability of alternative funds; (3) monitor the performance of portfolio managers; (4) monitor and control CapFinancial's performance and related trust costs; and (5) monitor the Plan's recordkeeping costs.[4]  *Id.* ¶¶ 22–121.

### a. **Availability of Alternative Share Classes**

First, plaintiffs contend that the Committee breached its fiduciary duty of prudence by failing to investigate the availability of lower-cost and equally or better performing share classes.  Compl. ¶¶ 29–43.  Specifically, plaintiffs allege that the Committee "failed to monitor, explore, and consider the lowest cost share class option for investments in the Plan," and instead "selected and thereafter retained the more expensive share classes of the same fund even though identically managed, higher yielding, higher returning types of the same fund were then available."  *Id.* ¶ 35.  As evidence of this practice, plaintiffs reference three funds that the Committee allegedly retained despite other identical and lower-cost share classes being available: (1) the T. Rowe

---

[4]  Plaintiffs' allegations that the Committee breached its duty of prudence by failing to monitor and control CapFinancial's performance and costs and monitor the Plan's recordkeeping costs do not appear to rely on the mismanagement of specific funds.  *See* Compl ¶¶ 80–121.  Nevertheless, for the sake of clarity, plaintiffs' standing to bring those claims will be discussed *infra*.

Retirement Trust "A" Fund; (2) the Loomis Sayles Small Cap Value Fund; and (3) the Loomis Sayles Small Cap Growth Fund. *Id.* ¶¶ 36–43.

Upon review, plaintiffs have failed to sufficiently allege an injury resulting from the Committee's alleged failure to investigate the availability of lower-cost and equally or better performing share classes. This is because plaintiffs have not shown that the Committee's challenged conduct resulted in a loss to their individual accounts. Plaintiffs do not assert that they invested in any of the above-mentioned funds or other funds that the Committee retained despite lower-cost and equally or better performing share classes being available. Moreover, plaintiffs have not sufficiently demonstrated that the Committee's challenged conduct amounted to plan-wide mismanagement that affected all plan participants. Consequently, plaintiffs have not plausibly alleged that they suffered an injury stemming from the Committee's alleged failure to investigate the availability of alternative share classes. Therefore, plaintiffs' claim, that the Committee breached its duty of prudence by failing to investigate the availability of lower-cost and equally or better performing share classes, must be dismissed for lack of standing.

### b. **Availability of Alternative Funds**

Second, plaintiffs allege that the Committee breached its fiduciary duty of prudence by failing to investigate the availability of lower-cost and better-

performing alternative funds.  Compl. ¶¶ 44–58.  Plaintiffs contend that the Committee selected and retained funds with excessive fees without considering whether the Plan received sufficient benefits to justify the cost of these funds or if other lower-cost funds were available.  *Id.* ¶¶ 46–52.  In support of these allegations, plaintiffs rely on two specific funds that the Committee allegedly retained despite alternative lower-cost funds being available: (1) the Loomis Sayles Small Cap Value Fund; and (2) the Fidelity Freedom 2030 Fund.[5]  *Id.* ¶¶ 48, 53–56.

Similarly, plaintiffs have not plausibly alleged that they suffered an injury as a result of the Committee's alleged failure to investigate the availability of lower-cost and better performing alternative funds.  As before, plaintiffs have failed to sufficiently allege that the Committee's challenged conduct caused a loss to their individual accounts.  Critically, plaintiffs do not allege that they personally invested in any of the above-mentioned funds or other funds that were selected and retained by the Committee despite lower-cost and better-performing alternative funds being available.  Additionally, plaintiffs have not sufficiently alleged that the Committee's challenged conduct amounted to plan-wide mismanagement that caused all plan participants to suffer a loss

---

[5]  Plaintiffs also reference other funds that allegedly had extra fees, but do not assert that lower-cost and better-performing alternative funds were available under the Plan.  *See* Compl. ¶ 46.  In any event, plaintiffs do not allege that they invested in these funds.  *See id.*

to their individual accounts.  As a result, plaintiffs have not shown that they suffered an injury resulting from the Committee's alleged failure to investigate the availability of alternative funds.  Thus, plaintiffs' claim, that the Committee violated the duty of prudence by failing to investigate the availability of lower-cost and better-performing funds, must be dismissed for lack of standing.

### c.  Performance of Portfolio Managers

Third, plaintiffs allege that the Committee breached its fiduciary duty of prudence by failing to investigate and monitor the performance of portfolio managers.  Compl. ¶¶ 59–79.  Plaintiffs assert that the Committee selected and retained funds with portfolio managers who were unskilled and charged excessive fees.  *Id.*  As evidence of this practice, plaintiffs draw attention to three funds that the Committee allegedly selected and retained despite the poor performance of their portfolio managers: (1) the Fidelity Freedom 2030 Fund;[6] (2) the Loomis Sayles Small Cap Value Fund; and (3) the T. Rowe Price Blue Chip Growth Fund.  *Id.* ¶¶ 61–72.

---

[6]  To be clear, plaintiffs argue more broadly that the "Fidelity target date funds" are an example of the Committee's failure to monitor the performance of portfolio managers.  *See* Compl. ¶¶ 61–62. However, plaintiffs only provide specific allegations concerning the Fidelity 2030 Target Freedom Fund.  *See id.*

Upon review, plaintiffs have plausibly alleged an injury stemming from the Committee's alleged failure to monitor the performance of portfolio managers.  Indeed, plaintiffs Collins and Lobdell allege that they invested in the T. Rowe Price Blue Chip Growth Fund—a fund that was retained by the Committee despite the fund's portfolio manager being unskilled and charging excessive fees.  Compl. ¶¶ 15, 17, 68–72.  Therefore, Collins and Lobdell have sufficiently shown that their individual accounts suffered a financial loss due to the Committee's alleged mismanagement of the T. Rowe Price Blue Chip Growth Fund.  Thus, plaintiffs have plausibly alleged that they suffered an injury resulting from the Committee's alleged failure to monitor the performance of portfolio managers.[7]

Nevertheless, defendants argue that plaintiffs' claim must be dismissed for lack of standing to the extent it relies on allegations that the Committee failed to monitor the portfolio managers for the Fidelity Freedom 2030 and Loomis Sayles Small Cap Value Funds.  Defs.' Mem. at 9, 13–16.  Defendants maintain that plaintiffs have not demonstrated that they suffered an injury stemming from the Committee's alleged mismanagement of these two funds

---

[7] "In a class action, '[s]tanding is satisfied so long as at least one named plaintiff can demonstrate the requisite injury.'"  *In re Unite Here Data Sec. Incident Litig.*, --F. Supp. 3d--, 2024 WL 3413942, at *2 (S.D.N.Y. July 15, 2024) (quoting *Hyland v. Navient Corp.*, 48 F.4th 110, 117 (2d Cir. 2022)).

because they do not allege that they invested in these funds. *Id.* Therefore, in defendants' view, plaintiffs' claim must be limited to allegations that the Committee failed to monitor the performance of the T. Rowe Price Blue Chip Growth Fund's portfolio manager. *Id.*

The Second Circuit has not definitively resolved the issue of whether and to what extent participants of a defined contribution plan must demonstrate individual harm in order to bring claims concerning funds that they did not personally invest in. *Garthwait v. Eversource Energy Co.*, 2022 WL 1657469, at *7 (D. Conn. May 25, 2022). Notably, however, the majority of other courts have found that plan participants, who have sufficiently alleged an injury to their own individual accounts by virtue of investing in at least one imprudent fund, may seek recovery for injuries stemming from the investment of other funds that were allegedly imprudent due to the same decisions or courses of conduct. *See, e.g.*, *Boley v. Univ. Health Servs., Inc.*, 36 F.4th 124, 131–33 (3d Cir. 2022); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 578 (7th Cir. 2022); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593–94 (8th Cir. 2009).

Following this majority approach, plaintiffs have sufficiently shown that they have standing to challenge the Committee's alleged failure to monitor the performance of the portfolio managers for the Fidelity Freedom 2030 and Loomis Sayles Small Cap Value Funds. As determined *supra*, plaintiffs

Collins and Lobdell have plausibly alleged that they suffered an injury to their own individual accounts by virtue of investing in the T. Rowe Price Blue Chip Growth Fund.  Furthermore, plaintiffs have sufficiently demonstrated that the Fidelity Freedom 2030 and Loomis Sayles Small Cap Value Funds are imprudent due to the same decisions or courses of conduct as the T. Rowe Price Blue Chip Growth Fund.  Indeed, plaintiffs maintain that all three of these funds were selected and retained despite the poor performance of their portfolio managers and the Committee's failure to investigate and monitor the performance of their portfolio managers was imprudent.  *See* Compl. ¶¶ 61–72.  As a result, plaintiffs may seek recovery on behalf of the Plan and its participants for injuries resulting from the Committee's alleged failure to monitor the performance of these two funds' portfolio managers.[8] Accordingly, plaintiffs' claim, that the Committee violated the duty of prudence by failing to monitor the performance of portfolio managers, will not be dismissed for lack of standing.

---

[8]  This finding is also supported by cases in this Circuit finding that plan participants, who have shown constitutional standing to raise claims based on their own injuries, may also have "class standing" to assert other claims unrelated to those injuries on behalf of unnamed class members. *See, e.g.*, *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 155–59 (S.D.N.Y. 2017).

### d.  <u>CapFinancial's Performance & Related Trust Costs</u>

Fourth, plaintiffs allege that the Committee breached its fiduciary duty of prudence by failing to monitor and control CapFinancial's performance and related trust costs.  Compl. ¶¶ 80–84.  Plaintiffs maintain that CapFinancial, as the Plan's financial advisor and investment manager, "was an excessively compensated and improvident advisor using trust assets (and being paid from trust assets) to service the Plan and received excessive fees for services that were not necessary."  *Id.* ¶ 81.  Plaintiffs contend that the Committee failed to evaluate whether CapFinancial's services justified its fees, and its failure to do so harmed every plan participant with an account balance.  *Id.* ¶¶ 81–83.

Plaintiffs have plausibly alleged an injury resulting from the Committee's alleged failure to monitor CapFinancial's performance and related trust costs.  To be clear, plaintiffs' allegations are thin.  Plaintiffs' complaint lacks details regarding CapFinancial's compensation and the effect of its alleged excessive fees on plan participants.  Nevertheless, plaintiffs' allegations are sufficient to support a plausible inference that the Committee's challenged conduct amounted to plan-wide mismanagement that caused every plan participant to suffer a financial loss.  Thus, plaintiffs have plausibly alleged an injury to their individual accounts due to the Committee's challenged conduct.  As a

result, plaintiffs' claim, that the Committee breached its fiduciary duty of prudence by failing to evaluate CapFinancial's performance and trust costs, will not be dismissed for lack of standing.

### d. **Recordkeeping Fees**

Lastly, plaintiffs contend that the Committee breached its fiduciary duty of prudence by failing to monitor the Plan's recordkeeping fees. Compl. ¶¶ 85–121. Plaintiffs allege that Fidelity, the Plan's recordkeeper, received excessive compensation directly from Plan assets and indirectly through the Plan's investments in a practice known as revenue sharing. *Id.* ¶¶ 91, 96, 113. Plaintiffs assert that the Committee failed to recognize that Fidelity's total compensation from all sources was unreasonable and the failure to do so caused plan participants to pay excessive recordkeeping fees. *Id.* ¶¶ 109, 115.

Upon review, plaintiffs' have sufficiently demonstrated that they suffered an injury stemming from the Committee's alleged failure to monitor the direct compensation paid to Fidelity. This is because plaintiffs have plausibly shown that direct fees were charged to every plan participant and as such, all plan participants' individual accounts suffered a financial loss. However, plaintiffs have not sufficiently shown that they suffered an injury as a result of the Committee's alleged failure to monitor the revenue sharing payments made to Fidelity. As discussed in more detail *infra* with respect to their duty

of loyalty claim, plaintiffs do not allege that they invested in any funds with revenue sharing, and plaintiffs' allegations are insufficient to suggest that the Committee's conduct amounted to plan-wide mismanagement that caused all plan participants to suffer a loss to their individual accounts. As a result, plaintiffs have not plausibly alleged that they suffered from the Committee's alleged failure to monitor revenue sharing payments. Therefore, plaintiffs' claim, that the Committee violated the duty of prudence by failing to monitor recordkeeping fees, must be limited to the extent it alleges that the Committee failed to monitor Fidelity's direct compensation.

## 2.  **Duty of Loyalty**

Finally, plaintiffs reference the mismanagement of specific funds in their second claim for breach of the fiduciary duty of loyalty. *See* Compl. ¶¶ 122–131. Plaintiffs maintain that the Committee breached its duty of loyalty by seeking "open-ended investment company revenue-sharing dollars for their own benefit." *Id.* ¶ 125. Specifically, plaintiffs contend that the Committee repeatedly selected "high-cost investments with revenue sharing so that it could use a portion of the fees to pay inflated fees to Fidelity," and other covered service providers. *Id.* ¶¶ 125, 130. In support of these allegations, plaintiffs reference two funds that the Committee allegedly retained, instead of seeking out funds with lower risk and higher returns, in order to receive

revenue sharing: (1) the Blackrock Total Return Fund; and (2) the Dodge & Cox International Fund.[9]  *See id.* ¶¶ 126–128.

Plaintiffs have failed to show that they suffered an injury stemming from the Committee's alleged selection of high-cost investments with revenue sharing.  Critically, plaintiffs do not allege that they personally invested in any of the above-mentioned funds or other high-cost funds with revenue sharing.  Furthermore, plaintiffs' allegations do not sufficiently suggest that the Committee engaged in plan-wide mismanagement that caused all plan participants' individual accounts to suffer a loss.  Consequently, plaintiffs have not shown that the Committee's alleged violation of the duty of loyalty caused them to suffer an injury.  Therefore, plaintiffs' breach of the duty of loyalty claim must be dismissed for lack of standing.[10]

---

[9]  In setting forth their claim that the Committee failed to monitor the Plan's recordkeeping fees, plaintiffs also assert that plan participants who invested in the Victory Small Company Fund paid excessive revenue sharing compensation.  *See* Compl. ¶ 107.  Plaintiffs do not allege that they invested in this fund.  *See id.*

[10]  As a final matter with respect to plaintiffs' standing to bring their violation of the duties of prudence and loyalty claims, plaintiffs' allegations that the Committee's mismanagement subjected them to "excessive fees and underperformance" are too vague and conclusory to show a cognizable injury.  *See Garthwait I,* 2021 WL 4441939, at *7 (finding that plaintiffs failed to plausibly allege standing where they alleged that they "suffered financial harm as a result of the Plan's imprudent investment options and excessive fees," but did not allege that they invested in the funds at issue).  Especially so considering that plaintiffs presumably have access to the details of their investments.  *See Pension Ben. Guar. Corp. (PBCG) v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719–20 (2d Cir. 2013) (detailing information that plan administrators are required to disclose to participants).

## B.  <u>Failure to State a Claim</u>

Defendants also seek dismissal of plaintiffs' claims under Rule 12(b)(6) for failure to state a claim.  *See* Defs.' Mem. 15–29.  After conducting a review of this Court's subject matter, plaintiffs' remaining claims are for violation of the fiduciary duty of prudence against the Committee (Count I), co-fiduciary liability against the Committee (Count III), violation of the fiduciary duty to monitor against Northeast Grocery (Count IV), prohibited transactions against the Committee (Counts V and VI), and violation of the fiduciary duty by omission against all defendants (Count VII).[11] [12]  Compl. ¶¶ 159–167, 177–222.

---

[11]  As an initial matter, defendants assert that dismissal is warranted because plaintiffs have not exhausted their administrative remedies.  Defs.' Mem. at 29–30.  In support of this argument, defendants point to language in the Plan agreement that in their view, requires plaintiffs to exhaust their claims before filing suit.  *See id.* at 19 n.4. However, this language appears to apply to claims for benefits under the Plan, not for violations of ERISA.  Thus, defendants have not shown that this language bars plaintiffs' claims.  Defendants also argue that dismissal is warranted because courts routinely dismiss claims where plaintiffs have not exhausted their remedies.  *Id.* at 29.  However, "most courts have distinguished between claims for benefits under the terms of the plan and claims for violations of the statute itself, and have held that only the former require exhaustion." *Disberry v. Emp. Rels. Comm. of Colgate-Palmolive Co.*, 646 F. Supp. 3d 531, 546 (S.D.N.Y. 2022) (citing *Hitchcock v. Cumberland Univ. 403(b) DC Plan*, 851 F.3d 552, 564 (6th Cir. 2017)).

[12]  Defendants also argue that plaintiffs' claims are barred by the statute of limitations.  Defs.' Mem. at 30–31.  Defendants assert that this is so because under the Plan, a participant must file a lawsuit "within 90 days of the date he/she knew (or should have known) that the Administrator disagreed with his/her position regarding benefits under the Plan or some other matter involving the Plan."  *Id.* at 30.  Again, this language appears to apply to claims for benefits under the Plan, and in any event, it is too vague to ascertain whether it applies to bar plaintiffs' claims.  Defendants also assert that plaintiffs' claims are untimely under ERISA because their "allegations are based on performance indicators available to them more than 3 years prior to the filing of this suit."  *Id.* at 31.  Defendants' argument is conclusory, and absent more specificity, must be rejected.

1. **Duty of Prudence**

As detailed *supra*, plaintiffs first allege that the Committee breached its
fiduciary duty of prudence.[13]  Compl. ¶¶ 22–121, 159–167.  Plaintiffs assert
that the Committee did so by failing to: (1) monitor the performance of
portfolio managers; (2) monitor and control CapFinancial's performance and
related trust costs; and (3) monitor the Plan's recordkeeping fees.  *See id.* ¶¶
59–121.

"ERISA imposes a duty of prudence upon plan fiduciaries,[14] directing
them to make reasonable investment and managerial decisions "with the
care, skill, prudence, and diligence under the circumstances then prevailing
that a prudent man acting in a like capacity and familiar with such matters
would use."  *Singh*, 650 F. Supp. 3d at 266 (S.D.N.Y. 2023) (quoting 29 U.S.C.
§ 1104(a)(1)(B)).  The duty of prudence is measured according to the objective
prudent person standard developed in the common law of trusts.  *Gonzalez*,
632 F. Supp. 3d at 161 (citing *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir.
2021)).  Pursuant to this standard, a fiduciary's actions are judged based on

---

[13]  As determined *supra*, plaintiffs do not have standing to challenge the Committee's failure to
investigate the availability of alternative share classes, investigate the availability of alternative
funds, or monitor Fidelity's recordkeeping compensation from revenue sharing.

[14]  To state a claim for breach of fiduciary duty, a plaintiff must allege that the defendant was a
fiduciary who was acting in a fiduciary capacity.  *Bloom v. AllianceBernstein L.P.*, --F. Supp. 3d--,
2024 WL 1255708, at *5 (S.D.N.Y. Mar. 25, 2024) (citation omitted).  Defendants do not contest that
the Committee is a fiduciary acting in a fiduciary capacity.

information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight. *Sacerdote*, 9 F.4th at 107 (citing *PBCG*, 712 F.3d at 716). Therefore, "[t]he focus is 'on a fiduciary's conduct in arriving at an investment decision, not on its results, and asks whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.'" *Singh*, 650 F. Supp. 3d at 266 (quoting *PBCG*, 712 F.3d at 716).

The fiduciary duty of prudence requires an ERISA fiduciary to "monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015); *see also Cunningham v. Cornell Univ.*, 86 F.4th 961, 983 (2d Cir. 2023). Thus, plan fiduciaries must conduct an independent evaluation to determine what investments may be prudently included in a plan's menu of options and remove any imprudent investments within a reasonable time. *Cunningham*, 86 F.4th at 983 (citing *Hughes v. Nw. Univ.,* 595 U.S. 170, 170 (2022)). Moreover, the duty of prudence "encompasses a duty to prevent plan participants from incurring excessive and unreasonable fees." *Vellali v. Yale Univ.*, 2022 WL 13684612, at *6 (D. Conn. Oct. 21, 2022). Therefore, plan fiduciaries must ensure that fees paid to third-party service providers are not excessive relative to the services rendered. *See id.* (citing *Sacerdote*, 9 F.4th at 107).

### a. __Performance of Portfolio Managers__

Plaintiffs allege that the Committee breached its duty of prudence by failing to monitor the performance of portfolio managers.  Compl. ¶¶ 59–79.  According to plaintiffs, the Committee selected and retained funds with portfolio managers who were unskilled and charged excessive fees.  *Id.*  In setting forth these allegations, plaintiffs do not provide any direct evidence of the Committee's process for evaluating the performance of portfolio managers.  *See id.*  Instead, plaintiffs suggest that it can be inferred, based on the underperformance of three portfolio managers, that the Committee's process for monitoring portfolio managers was imprudent.  *See id.*

Plaintiffs first allege that the portfolio manager for the Fidelity Freedom 2030 Fund underperformed.  Compl. ¶¶ 61–62.  As evidence of the portfolio manager's poor performance, plaintiffs maintain that the Fidelity Freedom 2030 Fund underperformed as compared to the T. Rowe Price 2030 Fund.  *Id.*  In particular, plaintiffs assert that: (1) the T. Rowe 2030 Fund had a higher five-year information ratio over the preceding ten years than the Fidelity Freedom 2030 Fund; (2) the Fidelity Freedom 2030 Fund had a fifteen-year "batting average"[15] of 40.56% while the T. Rowe 2030 Fund had a 49.44%

---

[15]  Plaintiffs allege that a "batting average" measures the portfolio manager's ability to beat the relevant market.  Compl. ¶ 62.

batting average; and (3) the Fidelity Freedom 2030 Fund's information ratio "over the prior 15-year period was a loss of 55 basis points (-0.55%), while the T. Rowe Price 2030 was significantly less of a loss of 15 basis points (0.15%)." *Id.*

These allegations are insufficient to give rise to a plausible inference that the Committee's selection and retention of the Fidelity Freedom 2030 Fund was imprudent.  To be clear, plan participants may properly allege a breach of the duty of prudence based on a fund's underperformance as compared to an alternative fund.  *See, e.g.*, *Kistler v. Stanley Black & Decker, Inc.*, 2024 WL 3292543, at \*9–10 (D. Conn. July 3, 2024); *Kohari v. MetLife Grp., Inc.*, 2022 WL 3029328, at \*7–8 (S.D.N.Y. Aug. 1, 2022).  However, in order to do so, plan participants must establish that the alternative fund is an adequate benchmark against which to compare the fund at issue.  *See Gonzalez*, 632 F. Supp. 3d at 164 (noting that plan participants must identify a "meaningful comparator" that outperformed the challenged fund).  Plaintiffs merely allege that the T. Rowe Price 2030 Fund is a "related" fund to the Fidelity 2030 Fund without setting forth any additional factual allegations concerning the similarities between the funds.  Absent more, plaintiffs have not shown that the T. Rowe Price 2030 Fund is an appropriate benchmark against which to

assess the Fidelity Freedom 2030 Fund's performance.[16]  *See Patterson*, 2019 WL 4934834, at *11–12 (dismissing duty of prudence claim where, *inter alia*, plaintiffs failed to plead sufficient facts to show that an alternative fund was comparable to the fund at issue).  As a result, plaintiffs have failed to provide any basis upon which the Court can properly assess the prudence of the Committee's alleged decision to select and retain the Fidelity Freedom 2023 Fund.  Consequently, plaintiffs' allegations regarding this fund do not support a finding that the Committee breached its duty of prudence by failing to monitor the performance of portfolio managers.

Next, plaintiffs maintain that the portfolio manager for the Loomis Sayles Small Cap Value Fund underperformed.  Compl. ¶¶ 63–67.  In support of this allegation, plaintiffs contend that the Loomis Sayles Small Cap Value Fund underperformed relative to three benchmarks indices over a ten-year period.  *Id.* ¶ 64.  In particular, plaintiffs assert that the fund underperformed "the unmanaged S&P SmallCap Value Index" by 0.14%, the "Morningstar Small Value Index" by 0.19% and the "S&P Small Cap 600" by 0.21%.  *Id.*  Plaintiffs also allege that the portfolio manager charged excessive fees and was unable to cover this cost with returns to plan participants.  *Id.* ¶ 63.

---

[16]  Even assuming the T. Rowe Price 2030 Fund is an adequate benchmark, plaintiffs have failed to provide sufficient details regarding the funds' comparable performance.  *See Patterson v. Morgan Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019).

Again, plaintiffs' allegations do not support a plausible inference that the Committee's selection and retention of the Loomis Sayles Small Cap Value Fund was imprudent.  While plan participants may properly "allege a breach of fiduciary duty based on a fund's underperformance relative to a benchmark index, the comparative underperformance must generally be 'consistent' and 'substantial' to support an inference of imprudence." *Gonzalez*, 632 F. Supp. 3d at 163 (quoting *Patterson*, 2019 WL 4934834, at *10).  Plaintiffs do allege a ten-year period of underperformance, which has been held to be sufficient in length to support a duty of prudence claim.[17] *Id.* (citing *Patterson*, 2019 WL 4934834, at *10).  However, plaintiffs have failed to plausibly allege that the fund's underperformance of less than one percent for all three benchmark indices was "substantial."  *See Ruilova v. Yale-New Haven Hosp., Inc.*, 2023 WL 2301962, at *15 (D. Conn. Mar. 1, 2023) (finding less than one percent underperformance over a ten-year period insubstantial); *Patterson*, 2019 WL 4934834, at *10 (same).  Furthermore, plaintiffs' allegations concerning the portfolio manager's fees fares no better—they are too vague and conclusory to

---

[17]  Nevertheless, plaintiffs do not allege when this information was available to the Committee such that it can be determined whether the Committee failed to remove the fund within a reasonable time.  *See* Compl. ¶ 64.

plausibly suggest that the portfolio manager underperformed.[18]  As a result, plaintiffs have failed to demonstrate that it was imprudent of the Committee to select and retain the Loomis Sayles Small Cap Value Fund.[19]  Therefore, plaintiffs' allegations regarding this fund do not support their claim that the Committee breached its duty of prudence by failing to monitor the performance of portfolio managers.

Finally, plaintiffs assert that the portfolio manager for the T. Rowe Price Blue Chip Growth Fund underperformed.  Compl. ¶¶ 68–72.  As evidence of the portfolio manager's poor performance, plaintiffs allege that the portfolio manager "is known for a high standard deviation and variance due to a low number of holdings of only 81 stocks (against its broad Russell 1000 and S&P 500 benchmarks)."  *Id.* ¶ 68.  Plaintiffs also assert that the portfolio manager "had never proven an ability to consistently and substantially earn his fee each year versus his 'appropriate broad-based securities market index.'"  *Id.*  Indeed, plaintiffs contend that the portfolio manager "lost over 4% per year since 2018 based on the geometric mean."  *Id.*  Lastly, plaintiffs contend that

---

[18]  In support of these allegations, plaintiffs assert that plan participants lost on average twenty basis points each year during the Class Period.  Compl. ¶ 67.  However, basis points measure a deviation from a benchmark, and plaintiffs do not specify which benchmark they are referring to.

[19]  Plaintiffs also allege that this fund's portfolio manager had a lower "batting average" than benchmark indices.  Compl. ¶ 66.  However, plaintiffs define "batting average," as a portfolio manager's ability to beat the relevant benchmark.  *Id.* ¶¶ 63–67.  Thus, it is unclear what plaintiffs are attempting to allege here.

the portfolio manager underperformed relative to a benchmark index over a ten-year period.  *Id.* ¶ 71.

Upon review, these allegations are insufficient to give rise to a plausible inference that the Committee's selection and retention of the T. Rowe Price Blue Chip Growth Fund was imprudent.  While plaintiffs do allege that this fund's portfolio manager departed from appropriate benchmarks, plaintiffs do not set forth in sufficient detail how substantial these departures were.  To be fair, plaintiffs do assert that he "lost over 4% per year since 2018[.]"  Compl. ¶ 68.  However, the duration of this underperformance is insufficient to create an inference of misconduct.[20]  *See Gonzalez*, 632 F. Supp. 3d at 163 (noting that ten-year data is the "traditional hallmark" of viable claims based on underperformance).  As a result, plaintiffs have failed to plausibly allege that the Committee's decision to select and retain the T. Rowe Price Blue Chip Growth Fund was imprudent.[21]  Thus, plaintiffs' allegations concerning this

---

[20]  Again, plaintiffs do not set forth when this information was available to the Committee such that it can be determined whether the Committee failed to remove the fund within a reasonable time.  *See* Compl. ¶ 68.

[21]  Plaintiffs also allege that "the concentration of holdings in the Blue Chip Growth Fund was massive, as the portfolio manager held 57% of the participants' wage dollars in only ten stocks," which "violated the Plan Committee's IPS and ERISA's diversification requirements."  Compl. ¶ 69.  However, plaintiffs fail to set forth any additional allegations concerning these diversification requirements.

fund do not support their claim that the Committee breached its duty of prudence by failing to monitor the performance of portfolio managers.

In sum, plaintiffs have not set forth sufficient factual allegations to show that the Committee's alleged selection and retention of the above-mentioned funds was imprudent.  Consequently, plaintiffs have failed to plausibly allege that by failing to evaluate these funds' portfolio managers, the Committee breached its fiduciary duty of prudence.  Accordingly, plaintiffs' fiduciary duty of prudence claim, to the extent it alleges that the Committee failed to monitor the performance of portfolio managers, must be dismissed.

**b.  CapFinancial's Performance & Related Trust Costs**

Next, plaintiffs allege that the Committee breached its duty of prudence by failing to monitor and control CapFinancial's performance and trust costs.  Compl. ¶¶ 80–74.  Plaintiffs assert that CapFinancial, as the Plan's financial advisor and investment manager, "received excessive fees for services that were not necessary." *Id.* ¶ 81.  According to plaintiffs, "the Committee did not investigate or monitor whether CapFinancial's services justified its fees," and the failure to do so, "harmed every participant[.]" *Id.* ¶¶ 83–84.

Upon review, plaintiffs' allegations fail to raise a plausible inference that the fees paid to CapFinancial were excessive and thus, imprudent.  Critically, plaintiffs do not set forth any specific factual allegations concerning how the

fees were excessive and unreasonable in comparison to fees provided to other financial advisors and investment managers. *See Ruilova*, 2023 WL 2301962, at *19 (noting that plan participants must provide a meaningful benchmark for comparison and cannot simply allege that costs are excessive). Without more, plaintiffs have failed to provide any basis from which to infer that the fees paid to CapFinancial were unreasonable. Accordingly, plaintiffs' duty of prudence claim, to the extent it alleges that the Committee failed to monitor and control CapFinancial's performance and trust costs, must be dismissed.

### c. **Recordkeeping Fees**

Finally, plaintiffs contend that the Committee failed to monitor the Plan's recordkeeping fees. Compl. ¶¶ 85–121. Plaintiffs maintain that Fidelity's compensation was unreasonable and excessive. *Id.* ¶¶ 113, 115. In support of this allegation, plaintiffs contend that the compensation paid to Fidelity, as compared to recordkeepers for other plans of similar sizes, was significantly higher. *Id.* ¶ 97. As an example, plaintiffs contend that the Molson Coors Beverage Company Plan (the "Molson Plan"), of which Fidelity is also the recordkeeper for, charges its participants lower recordkeeping fees. *Id.* ¶ 98.

Plaintiffs allege that the services Fidelity provides to the Molson Plan and the Plan at issue here are "virtually identical." *Id.*

These allegations are insufficient to support a plausible inference that the compensation paid to Fidelity was excessive. Plan participants "must allege more than just that the 401(k) Plan's recordkeeping fees were higher than those of other plans." *Singh*, 650 F. Supp. 3d at 266. In fact, courts in this Circuit have found that plan participants must allege that recordkeeping fees were excessive relative to the specific services the recordkeeper provided to the specific plan at issue. *Id.* (citing *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019); *see also Gonzalez*, 632 F. Supp. 3d at 167 (citation omitted). Here, plaintiffs have failed to do so. They do not allege with specificity what recordkeeping services the Plan and the Molson Plan receive from Fidelity.[22] Without more, plaintiffs have not created a plausible inference that Fidelity's fees were excessive relative to the

---

[22] Plaintiffs' allegations comparing the two plan's fees are also vague. Plaintiffs provide the Molson Plan's total fees per participant annually and the direct fees per percentage of assets. Compl. ¶ 98. In contrast, plaintiffs provide the Tops non-union Plan's total fees per participant and the total fees per percentage of assets, and the Tops' union Plan's direct fees per participant and direct fees per percentage of assets *Id.* ¶ 100. Because plans commonly pay recordkeepers through direct and indirect compensation, plaintiffs' allegations provide limited insight into whether the Plan's direct fees were excessive. *See Singh*, 650 F. Supp. 3d at 267; *Gonzalez*, 632 F. Supp. 3d at 166.

services provided.[23]  Thus, plaintiffs' claim, that the Committee violated its

duty of prudence by failing to monitor the Plan's recordkeeping fees, must be

dismissed.  Consequently, plaintiffs' breach of the fiduciary duty of prudence

claim must be dismissed in its entirety.

## 2. **Remaining Claims**

Plaintiffs have five remaining claims for co-fiduciary liability against the

Committee (Count III), violation of the fiduciary duty to monitor against

Northeast Grocery (Count IV); prohibited transactions against the Committee

(Counts V and VI); and violation of the fiduciary duty by omission against all

defendants (Count VII).  Compl. ¶¶ 159–222.  Plaintiffs' claim for co-fiduciary

liability alleges that the Committee is liable for participating in, and failing

to prevent, the breaches by other plan fiduciaries.  *Id.* ¶¶ 177–79.  Plaintiffs'

claim for violation of the fiduciary duty to monitor alleges that Northeast

Grocery is liable for failing to monitor the Committee's performance, evaluate

the Plan's expenses and investments, and remove the Committee as a

fiduciary.  *Id.* ¶¶ 180–86.  Plaintiffs' fifth and sixth claims for prohibited

transactions alleges that the Committee is liable for including and failing to

---

[23]  Plaintiffs also allege that the fees paid to Fidelity were "far more significant" than fees for other plans without providing any details as to the size of these plans, or what services the recordkeepers for these plans provide.  *See* Compl. ¶ 101.  As a result, these allegations are too vague and conclusory.

remove imprudent funds, and for selecting and retaining imprudent funds in order to earn a profit for Fidelity and CapFinancial through revenue sharing and kickback arrangements. *Id.* ¶¶ 195–09. Lastly, plaintiffs' claim for breach of the fiduciary duty by omission alleges that defendants are liable for failing to institute a claim against themselves, on behalf of the Plan, for engaging in prohibited transactions. *Id.* ¶¶ 210–22.

Plaintiffs' remaining claims must be dismissed. These claims depend on a finding that the Committee breached its underlying duties of prudence and loyalty. But as determined *supra*, plaintiffs have insufficiently pleaded these claims, and thus, their remaining claims cannot survive. *See Bloom*, 2024 WL 1255708, at *10–11 (dismissing duty to monitor and co-fiduciary liability claims where plaintiffs failed to plausibly allege an underlying breach of fiduciary duty). Accordingly, plaintiffs' remaining claims must be dismissed, and plaintiffs' complaint shall be dismissed in its entirety.

## C. **Leave to Amend**

As a final matter, plaintiffs request leave to file an amended complaint in their opposition memorandum. *See* Pls.' Opp'n, Dkt. No. 13 at 7, 29. There, plaintiffs assert that if defendants' motion to dismiss is granted, "this Court should grant [their] leave to amend, as amendment would not be futile." *Id.* at 29.

"Rule 15(a)(2) provides that leave to amend should be freely given 'when justice so requires.'" *Fish v. Tom's of Maine, Inc.*, --F. Supp. 3d--, 2023 WL 8530341, at *7 (N.D.N.Y. Dec. 8, 2023) (quoting FED. R. CIV. P. 15(a)(2)).  The Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006).  However, leave to amend need not be granted when amendment would be futile. *Byrd v. Town of DeWitt*, 698 F. Supp. 3d 379, 386 (N.D.N.Y. 2023) (citing *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003)).

Upon review, leave to amend will be denied.  The Court recognizes that this is plaintiffs' first attempt at setting forth these claims and courts should freely give leave to amend when justice so requires.  Even so, amendment in this instance would be futile.  Notably, Local Rule 15.1(a) requires a party seeking leave to amend to submit a copy of the proposed pleading "such that the court may consider the proposed amended pleading as the operative pleading." N.D.N.Y. L.R. 15.1(a).  Plaintiffs have not done so.  They simply request leave to file an amended complaint in their opposition memorandum without setting forth anything to suggest that they could cure the deficiencies identified here. *See* Pls.' Opp'n at 7, 29.  Without more, there is no indication

that amendment is warranted.  Consequently, plaintiffs' request for leave to file an amended complaint must be denied.

## V.  CONCLUSION

Therefore, it is

ORDERED that

1.  Defendants' motion to dismiss (Dkt. No. 10) is GRANTED;

2.  Plaintiffs' complaint is DISMISSED without leave to amend; and

3.  The Clerk is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

Dated:  August 15, 2024
        Utica, New York.

David N. Hurd
U.S. District Judge